Patricia A. RANIOLA, Plaintiff–Appellant,

v.

Police Commissioner William BRATTON; Police Commissioner Howard Safir; New York City Police Department; Rudolph Giuliani, Mayor; The City of New York; Anthony Kissik, Defendants–Appellees.

Docket No. 00–7215.

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 2000.

Decided March 19, 2001.

Daniel B. Gazan, Jeffrey L. Goldberg, P.C., Elmhurst, NY, for plaintiff-appellant.

George Gutwirth, for Michael D. Hess, Corporation Counsel of the City of New York (Francis F. Caputo, of Counsel), for defendants-appellees.

Before STRAUB, SOTOMAYOR, Circuit Judges, and AMON, District Judge.*

SOTOMAYOR, Circuit Judge:

Patricia Raniola was an officer in the New York City Police Department ("NYPD") for thirteen years. After receiving commendations for her early police work, the police department claims that Raniola became a frequent violator of the police disciplinary code—accumulating an extensive record of not following police procedures, failing to appear when needed in court, losing police property, not filing required paperwork, being discourteous,

and lateness—which led to her suspension and eventual termination from the police department. Raniola tells a very different story. She claims that she was subjected to years of abuse including derogatory remarks, disproportionately burdensome assignments, sabotage of her work, threats, and false accusations of misconduct, all because she was a woman and had complained of her mistreatment.

Three days into a jury trial on Raniola's civil rights claims, with several witnesses for Raniola still to be called, the district court considered proffers of the remaining testimony and then invited motions for judgment as a matter of law. After oral argument, the court granted defendants' motion and dismissed the complaint. This appeal followed.

We find that Raniola presented enough evidence to reach the jury on her hostile work environment and retaliation claims and therefore vacate the district court's judgment and remand for a new trial on these two claims together with Raniola's pendent state and municipal law claims. We affirm the district court's grant of judgment as a matter of law on all of Raniola's remaining federal claims.[1] Viewed in the light most favorable to Raniola as the party challenging the grant of judgment as a matter of law, the testimony and documents in the record present the following facts.

## BACKGROUND

### A. Facts

Patricia Raniola joined the NYPD in January 1983. She was assigned to the 52nd precinct and received several police commendations during her first years of service. Raniola was suspended from the

---

* The Honorable Carol Bagley Amon, United States District Judge for the Eastern District of New York, sitting by designation.

1. Counsel for Raniola waived her *quid pro quo* claim at oral argument. All of Raniola's other federal claims were similarly waived by either inadequate briefing or argument during trial or on appeal, including alleged violations of 42 U.S.C. §§ 1981, 1983, the Americans With Disabilities Act of 1990, 42 U.S.C. § 12111 *et seq.*, and other alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, not otherwise discussed in this opinion.

NYPD in September 1986 after being charged with not calling a supervisor to the scene of an injury, falsely reporting a line of duty injury, and supplying false information on a witness statement.

In May 1987, Raniola filed complaints against the NYPD with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination[2] and retaliation, and in federal court alleging violations of 42 U.S.C. § 1983.[3] While suspended, Raniola pled guilty in an internal police proceeding to the unlawful possession of a police parking permit.

In May 1990, Raniola was reinstated to the 52nd precinct after a successful EEOC conciliation. From her reinstatement in 1990 until December 1991, Raniola appears to have encountered no significant problems at work, although a substantial portion of this time, from February to October 1991, Raniola was on maternity leave.

Beginning in December 1991, Raniola again began to experience disciplinary problems. Raniola testified that some of these problems were due to personal and family difficulties. From December 1991 to January 1993, Raniola received at least four "command disciplines" for disciplinary violations. Her 1992 performance evaluation noted that she fell below standards in some areas, mentioning a problem with lateness, 19 minor violations, and a "chronic A" health classification, indicating that she had called in sick four times during the previous year.

In February 1993, Raniola was "administratively" transferred to the 50th precinct after another disciplinary incident in which Raniola was accused of being discourteous to a nonuniformed member of the NYPD. Raniola's treatment at the 50th precinct provides the basis for her hostile work environment and retaliation claims.

The 50th precinct was commanded by Captain Anthony Kissik. Raniola was the target of sex-based derogatory remarks by Capt. Kissik and other comments written on a notice advertising a police event. Kissik once threatened Raniola with physical harm. A desired shift and the opportunity to work back-to-back shifts that were denied to Raniola were granted to male officers. Raniola and her female partner were given the most burdensome work assignments in the precinct. A commendation available to male officers was not available to Raniola and her female partner. Raniola was subjected to workplace sabotage resulting in her being disciplined for incidents beyond her control. During her two and a half years at the 50th precinct, Raniola received six "command disciplines." Soon after Raniola filed an EEOC complaint to redress her alleged mistreatment, Capt. Kissik took several adverse actions against her and announced to officers assembled after roll call, when Raniola was the only female officer in the room, "listen up everybody, we have a problem. There ... is a rat here in the precinct. Until I get rid of her, we are all in this together." Raniola proffered testimony that would have established that Kissik had singled out Raniola for discipline, heavier workloads, and unfavorable assignments in an effort to force Raniola to resign from the NYPD, and that Raniola's name was on a police "hit list" indicating she should be terminated if at all possible. Captain Kissik transferred Raniola to the 112th precinct in July 1995.

Upon her arrival at the 112th precinct, Raniola's disciplinary problems generally ceased, and, at the end of her first year there, she was given a favorable evaluation. While at the 112th precinct, however, Raniola was prosecuted for disciplinary charges involving her prior conduct at the

---

**2.** In accord with the language of Title VII, we use the term "sex," instead of "gender," to identify the class protected by the statute. *See* 42 U.S.C.2000e–2(a)(1) (prohibiting discrimination "because of ... sex").

**3.** This complaint also contained an allegation of violations of 42 U.S.C. § 1985 that was dismissed by the district court on January 11, 1988. That dismissal has not been challenged on appeal.

50th precinct, charges that resulted in her suspension and placement on termination-probation. In September 1996, Raniola was terminated from the NYPD for a remark she allegedly made while off duty.

The incident that resulted in her termination occurred on June 17, 1996, at the home of a former co-worker at the 50th precinct, Gloria Gonzalez. Raniola had parked in front of Gonzalez's home and shouted up to her asking whether she wanted to go out to eat. According to Raniola's testimony at trial, Gonzalez responded that officers from the Internal Affairs Bureau of the NYPD were in Gonzalez's apartment and that Gonzalez would meet Raniola later. Raniola claims that at this point she told Gonzalez, "[i]f they are harassing you, . . . make a complaint," and left. According to a subsequent police disciplinary report, however, Raniola said to Gonzalez, "[w]hy are those assholes harassing you, fuck you guys from I–A–B, take my plate, I don't care." The NYPD determined that this comment constituted "conduct prejudicial to the good order, efficiency and discipline of the Department," indicated "a refusal to conform with the standards required for continued employment with the New York City Police Department," violated Raniola's probation, and warranted Raniola's termination.

Prior to her termination in September 1996, Raniola had filed an internal police department complaint in April or May 1995 and an EEOC complaint in July 1995 seeking redress for her alleged mistreatment at the 50th precinct. The EEOC issued a right to sue letter on March 19, 1996, and Raniola filed her civil rights complaint in federal court on June 17, 1996.[4]

On appeal, Raniola challenges the judgment as a matter of law granted as to her claims that: (1) she experienced a hostile work environment because she was a woman; and (2) she was suspended, put on probation, and terminated in retaliation for having complained of her harassment.

B. The District Court's Ruling on Defendants' Motion for Judgment as a Matter of Law

Addressing Raniola's hostile work environment claim, the district court characterized Raniola's treatment as typical of "the camaraderie of a precinct house," which lacks "[s]ome of the niceties of expression that one would expect" in many other workplaces. The court found that there was "no evidence that plaintiff herself felt that the use of barnyard street expletives directed to her or directed to others made her work environment offensive," or "that plaintiff was intimidated in terms of her work or suffered[,] because of any expletives[,] any inability or difficulty in performing her work."

Regarding Raniola's treatment by other officers at the 50th precinct, the district court acknowledged that the "[t]he evidence . . . suggests that the plaintiff . . . was the object of treatment that was very difficult for her," but concluded that

> there is no evidence that those who reacted to that history [of disciplinary problems] were focusing on gender rather than the person. They were focusing on the plaintiff, Patricia Raniola, because they disliked her intensely and made life difficult for her, at least that's what the testimony suggests and that's what a jury could believe.

The court dismissed "various anecdotal [ac]counts of [disparate] treatment as between men and women" and Raniola's complaints of more onerous work assignments because this evidence did not "constitute the kind of proof [from] which a jury could infer discrimination." Based on these findings, the district court held that Raniola had not experienced an abusive work environment in violation of Title VII.

---

**4.** On March 24, 1997, Raniola filed a second complaint, adding additional claims, that the district court consolidated with her first complaint.

Turning to Raniola's retaliation claim, the district court identified the filing of Raniola's July 1995 EEOC complaint as an activity protected from retaliation by Title VII. While the district court noted that Raniola had made an internal police complaint in 1995 which included allegations of discrimination, the court stated that "there is no evidence in the record that gender discrimination was made the focus of any inquiry by the Bronx IAB [Internal Affairs Bureau], nor that they brought that claim to the attention of Captain Kissik, the precinct commander, so those aspects of a potential retaliation claim are absent." The court recognized, however, that "[t]he evidence suggests that Captain Kissik may have, in reaction to the complaint to the Bronx IAB, assigned the plaintiff and Police Officer Swinton [another IAB complainant] to foot patrols in the department," but found that these activities are "part of the police job ... [such that] a reasonable jury cannot find that assignment to regular police activity [w]as a punishment." The court noted that both the disciplinary charges filed by Kissik against Raniola after her transfer out of his command in the 50th precinct and her termination occurred after Raniola's filing of her EEOC complaint but declined to view this as evidence of retaliation. Moreover, the court held that Kissik's charges against Raniola and the disciplinary action that followed "cannot constitute proof of retaliation" because Raniola was found guilty of some or all of the charges in a police administrative proceeding. Regarding the incident at Gloria Gonzalez's house that resulted in Raniola's termination, the district court held that:

> Whether [Raniola] said anything ... disrespectful [about] the investigative officers who were interviewing Ms. Gonzalez[ and] whether they were mistaken in hearing what [Raniola] said is not relevant, because there is no connection [between] their reaction and the ultimate termination of the plaintiff [and] a claim of retaliation.

Accordingly, the district court granted defendants' motion as a matter of law dismissing all of Raniola's federal claims, and, in the exercise of its discretion, dismissed Raniola's remaining pendent state and municipal law claims.

## DISCUSSION

### A. Standard of Review

■■■ A court may render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a).[5] In reviewing the evidence in the record, "the court must draw all reasonable inferences in favor of the nonmoving party[;] ... it may not make credibility determinations or weigh the evidence ... [and must] disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000); *see also Nelson v. Metro–North Commuter R.R.*, 235 F.3d 101, 105 (2d Cir.2000) (viewing evidence "in the light most favorable to the nonmoving party" in reviewing grant of judgment as a matter of law) (internal quotation marks omitted). In reviewing a district court's grant of judgment as a matter of law, "we apply the same standard as the district court itself was re-

---

**5.** While it is true that "[u]nder Rule 50(a), a party may move for judgment as a matter of law [ ] during trial at any time prior to the submission of the case to the jury," *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir.1998), we have cautioned trial courts to grant such motions sparingly prior to when the jury renders its verdict. Especially for liability determina-tions, in light of the need for a new trial if this Court later vacates the grant of judgment as a matter of law, it is often "preferable, in the best interests of efficient judicial administration [,] ... to allow the case to be decided, at least in the first instance, by the jury." *Vasbinder v. Ambach*, 926 F.2d 1333, 1344 (2d Cir.1991) (internal quotation marks omitted).

quired to apply." *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000).

## B. Hostile Work Environment

■ Under Title VII, a hostile work environment is one form of disparate treatment on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is "abusive." *Harris v. Forklift,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (relying on congressional intent to "strike at the entire spectrum of disparate treatment of men and women in employment" in permitting Title VII claims to challenge a discriminatory hostile work environment).

■ A work environment is "abusive" when harassment has reached a certain qualitative level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment." *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399 (internal quotation marks omitted). To decide whether conduct rises to this level, "the trier of fact must determine the existence of sexual harassment in light of the record as a whole and the totality of [the] circumstances." *Meritor,* 477 U.S. at 69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted). Within the totality of the circumstances are "the quantity, frequency, and severity of the incidents ... factors [that] must be considered cumulatively, so that we may obtain a realistic view of the work environ-

ment." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 437 (2d Cir.1999) (internal quotation marks and citations omitted). The focus of this inquiry, therefore, is "the nature of the environment itself." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir. 1997); *see also Williams v. General Motors Corp.,* 187 F.3d 553, 563 (6th Cir. 1999) ("[T]he totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action.").

■ In a hostile work environment claim, the "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). As a leading treatise has explained: "Although sexual harassment is usually thought of in terms of sexual demands, it can include employer action based on [sex] but having nothing to do with sexuality. For example, a woman, entering a work environment that previously has been all-male, might encounter severe, sustained hostile treatment by her male supervisors and/or co-workers." 3 Lex K. Larson, Employment Discrimination § 46.01[3] (2d ed.2000); *see also* 1 Barbara Lindemann and Paul Grossman, Employment Discrimination Law 781 (3d ed.1996) ("[A] hostile environment is not limited to sexual advances or even to sexual behavior targeted at the complainant.").[6]

---

**6.** *See also Smith v. First Union Nat'l Bank,* 202 F.3d 234, 242 (4th Cir.2000) (reversing summary judgment for defendant in a hostile work environment claim after the district court "failed to recognize that a woman's work environment can be hostile even if she is not subjected to sexual advances or propositions"); *Smith v. Sheahan,* 189 F.3d 529, 533 (7th Cir.1999) ("It makes no difference that

the assaults and the epithets sounded more like expressions of sex-based animus rather than misdirected sexual desire.... Either is actionable under Title VII as long as there is evidence suggesting that the objectionable workplace behavior is based on the sex of the target."); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1265 (8th Cir.1997) (reversing summary judgment for defendant in a hostile work en-

Based on the totality of the circumstances discussed below, we hold that the evidence was legally sufficient for a reasonable jury to find that Raniola was subjected to a hostile work environment because she was a woman. We reach this conclusion in view of all of the evidence of mistreatment, including (1) the verbal abuse directed at Raniola on the basis of sex; (2) the disparate treatment of Raniola in the workplace on the basis of sex; and (3) the workplace sabotage suffered by Raniola at the 50th precinct.

### 1. Evidence of Sex–Based Verbal Abuse

In February 1993, during Raniola's first week at the 50th precinct, Captain Kissik approached her and began discussing the fact that his daughter-in-law did not permit his granddaughter to have candy and stated that his daughter-in-law was an "asshole." Kissik then commented that his daughter-in-law, "wears the pants in the family[;] my son-in-law [sic] doesn't smack her around" or words to that effect. Around September 1993, Raniola found the word "cunt" written across her name in an official police ledger. Her female partner had something written over her name. Both complained to the precinct's Integrity Control Officer ("ICO"), Lt. Frank Leissler, who replied that "if you make a formal complaint and bring it to the EEO of the precinct ... Kissik will make your lives more miserable than they already are [because ... i]t would bring an investigation in the precinct and [Kissik does not] want that." When Raniola sought to examine the ledger for purposes of this litigation, she found that the word "cunt" had been whited-out, and another officer's name had been written over it.

In 1995, while addressing a platoon of officers, Kissik discussed a directive from police headquarters to make more arrests for violations of domestic violence protective orders. Raniola testified that Kissik, standing directly in front of her, stated, "[i]f you get to a job, meaning a family dispute, if you get to that job and the bitch has that [protective order] in her hand," then the officer should make the arrest.[7] In July 1995, Raniola saw a flyer posted in a precinct elevator advertising a fishing trip, on which was written, "SWINTON = PAPPY MASON PERP BITCH," and "FREE BLOW JOBS BY RANIOLA & SWINTON," and the word "CUNTS" with an arrow to the names of Raniola and her female partner Swinton.[8]

vironment claim and remanding for consideration of non-sexual derogatory comments directed toward women more frequently than men); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 905 (1st Cir.1988) (finding non-sexual conduct may give rise to a hostile work environment claim if it evinces "anti-female animus, and therefore could be found to have contributed significantly to the hostile environment"); *McKinney v. Dole*, 765 F.2d 1129, 1139 (D.C.Cir.1985) ("A pattern of threatened force or verbal abuse, if based on the employee's sex, may be illegally discriminatory. In fact, any disparate treatment, even if not facially objectionable, may violate Title VII."), *rev'd in part on other grounds sub nom. Stevens v. Dept. of Treasury*, 500 U.S. 1, 111 S.Ct. 1562, 114 L.Ed.2d 1 (1991).

**7.** Following this statement on direct examination, Raniola's counsel sought to ask Raniola whether Kissik was aware, when making this comment, that Raniola had been a victim of domestic violence and had been given an order of protection. The district court sustained objections to these questions without reference to the basis for the objections or the court's reasoning in sustaining them. If Raniola had previously made Kissik aware that she had been the victim of domestic violence and had been given a protective order, the fact that Kissik knew this would be competent evidence to demonstrate his intent in appearing to direct his reference to a "bitch" at Raniola.

**8.** During argument on defendant's motion for judgment as a matter of law, counsel for Raniola stated that this poster "was posted in various locations in the precinct. We have testimony on that." No such testimony was presented at trial. If, by this statement, counsel for Raniola was seeking to make an additional proffer of testimony that the witnesses remaining to be called were prepared to offer, this proffered evidence would tend to magnify the abusive effect of the statement made in the poster.

## 2. Evidence of Disparate Treatment

In February 1993, Kissik denied Raniola's request to work a 4 to12 shift. According to Raniola, a total of eight men had previously asked for similar shifts and had received them. In May 1994, Kissik denied Raniola's request for back-to-back shifts to enable her to leave early for a planned vacation, stating that he did not approve such requests. The day Raniola returned from vacation, she observed a male officer at the precinct working a back-to-back shift.

Raniola testified that she and her female partner Kim Swinton were given the most onerous work assignments in the precinct. Raniola testified that Captain Kissik gave both women monthly quotas—of 25 moving violations and 25 parking violations—that were higher than "everybody else" in the precinct. Raniola and Swinton were assigned to the sector of the precinct that was the "largest, [and] most heavily populated with multiple dwellings." According to Raniola, it was a "very undesirable assignment" because an adult home located within its bounds generated a considerable amount of time-consuming work. In addition to this assignment, Raniola and Swinton were responsible for an additional sector of the precinct whenever a male officer responsible for that sector arrived late to work from a second job. Raniola and Swinton were the only officers assigned by Kissik to perform safety inspections of taxi and bus drivers. Raniola and Swinton were also twice assigned to undesirable postings during labor strikes despite the fact that such work was normally given to the most junior members of the squad and Raniola and her partner were, at the time, the most senior officers on their shift.

In addition, Raniola and Swinton were denied a commendation after assisting two male officers in making a significant arrest. The male officers, following police procedure, requested that both they and the female officers receive commendations. Kissik told the officers who made the request to rewrite it without the names of the two women. Raniola's counsel also proffered that former police officer Gloria Gonzalez would testify as to the poor treatment she had received after being administratively transferred "like these other women" into the 50th precinct.

Raniola presented other evidence that officials within the police department were targeting her for abusive treatment. Raniola proffered that Sergeant Burgess would testify that Kissik had "told him to single out Patricia Raniola for discipline, for a heavier workload, occasionally for undesirable assignments and that [Kissik] generally ordered Sergeant Burgess to give her a hard time and force her to quit." Raniola also proffered that Daniel Figueroa from the police department advocate's office would testify that Raniola's name was on a departmental "hit list," a "list of officers who, should their names come up in any discipline, were to be severed from the police department if at all possible." Figueroa would testify, according to the proffer, that he was assigned Raniola's case after the alleged incident at Gloria Gonzalez's home, that he was given the assignment of drawing up charges to terminate Raniola, and that he hesitated to do so because he did not believe that the allegations, even if true, were serious enough to justify her termination. The proffer also stated that Figueroa had tried to resist completing this assignment, but learned that Raniola was meant to be terminated and that the falsified charges provided the needed opportunity.

Raniola also testified that Kissik, addressing an August 1994 police roll call, stated that, "if Raniola opens her head, opens her mouth, I am going to put one in her fucking head," which Raniola understood to mean that Kissik would shoot Raniola. Kissik later attempted to apologize to Raniola for the remark.

## 3. Evidence of Workplace Sabotage

■ Evidence of workplace sabotage can be relevant to claims of a hostile work

environment. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1473 (3d Cir. 1990) (files destroyed or stolen); *Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 910–11 (1st Cir.1988) (records altered). A series of unexplained misfortunes befell Raniola at the 50th precinct. In June 1994, Raniola's monthly police activity report disappeared after Raniola had timely filed it, an incident for which Raniola was later disciplined. On October 28, 1994, Raniola left a police memo book in her patrol car. Another officer secured it in the property room and informed Raniola where he had left it, but it was missing when Raniola went to pick it up. Raniola reported that the memo book was stolen, but later found that her report had been altered to read that the book was "lost," another incident for which Raniola was disciplined. In 1994 and 1995, police administrative aides found that Raniola's police paperwork had been put in the trash. On March 3, 1995, Sergeant Hopkins reported that Raniola had failed to sign out, even though Raniola had not worked on the day in question. Later, the date on which Raniola had allegedly failed to sign out was changed, and, although such violations were usually overlooked, Raniola was again written up for a disciplinary violation. Although the limited record that the district court permitted to be developed at trial is silent as to whether anyone else in the precinct had suffered the same travails, the evidence is sufficient for a reasonable jury to find that Raniola was singled out for abuse.[9]

### 4. The Severity and Pervasiveness of the Abuse

■ To establish the existence of a hostile work environment, the plaintiff must show both that the environment was objectively hostile and that the plaintiff subjectively perceived it to be hostile:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris,* 510 U.S. at 21–22, 114 S.Ct. 367.

■ As to the objective measure of abuse, "[t]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999) (internal quotation marks omitted). To succeed, a plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted). The Supreme Court has set forth a non-exclusive list of factors to consider when evaluating a workplace environment, consisting of

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-be-

**9.** *See also Gonzalez v. Police Comm'r Bratton,* Nos. 96 Civ. 6330, 97 Civ. 2264, 2000 WL 1191558, at *11 (S.D.N.Y. Aug.22, 2000) (denying defendants' motion for summary judgment in a Title VII case brought by Gloria Gonzalez, apparently the same former police officer who was expected to testify in Raniola's trial, that presented similar factual allegations of mistreatment at the 50th precinct under Capt. Kissik, and concluding that "for such a patterned ordeal to afflict the same individual on the job inside a few years falls well beyond the succession of adversities that reasonably may be ascribed to sheer coincidence, to the fault of fate or to what the laws of probabilities would predict chance unaided by human devices and interventions would randomly visit upon the same soul").

ing is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris,* 510 U.S. at 23, 114 S.Ct. 367. Because the Supreme Court has stated that no single factor from this list is necessarily required, the district court erred in stating that Raniola must prove that she was "intimidated in terms of her work or suffered ... [an] inability or difficulty in performing her work" in order for her claim to succeed.

Viewing the evidence in its totality, we conclude that there was sufficient proof for a reasonable jury to find that Raniola's abuse was so severe and pervasive as to constitute a hostile work environment in violation of Title VII. Taking all of the evidence and proffers of testimony in the light most favorable to Raniola, the record discloses that within the space of two and a half years time, Raniola was subjected to offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm by Captain Kissik. A reasonable jury could find that these incidents were sufficiently continuous and concerted to have altered the conditions of Raniola's work environment.

Raniola must also prove that she subjectively perceived her treatment as abusive. We disagree with the district court's conclusion that "[t]here is no evidence that plaintiff herself felt that the use of barnyard street expletives directed to her or directed to others made her work environment offensive," and find that there was substantial evidence upon which a reasonable jury could find that Raniola perceived her treatment as abusive. Raniola testified that after she discovered that the

word "cunt" was written across her name in a police ledger, she went to the precinct's Integrity Control Officer Lt. Frank Leissler to complain. After Kissik told Raniola that his daughter-in-law "wears the pants in the family, my son-in-law [sic] doesn't smack her around," Raniola testified that she "just wanted to get away from [Kissik]."[10] Following Kissik's reference to a woman who had a protective order as a "bitch," Raniola lodged a complaint against Kissik with the Bronx IAB that included an allegation of sex discrimination. Based on these facts, a reasonable jury could conclude that Raniola perceived her treatment to be abusive.

5. The Sex–Based Nature of the Abuse

A plaintiff pursuing a sex-based hostile work environment claim "must always prove that the conduct at issue was not merely tinged with offensive connotations, but actually constituted discrimination because of sex." *Oncale,* 523 U.S. at 80–81, 118 S.Ct. 998 (internal citation, ellipses, and alternation omitted). In many cases, this task is made easy when the "victim is harassed in such sex-specific and derogatory terms ... [as] to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Id.* at 80, 118 S.Ct. 998; *cf. Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). The task is made more difficult when the discriminatorily hostile environment is a product of both sex-specific verbal abuse and other adverse treatment. To demonstrate that all of the alleged abuse was on account of sex, Raniola may either show that the sex-based verbal abuse indicated that other adverse treatment was also suffered on account of sex, or resort to cir-

10. The district judge ordered this remark stricken from the record, apparently because it was not responsive to the question of whether Kissik had said anything more, and instructed Raniola "[d]on't talk about your reaction. Just tell the conversation." Evidence of Raniola's subjective perception of Kissik's comments is, however, relevant to this inquiry.

cumstantial proof that the other adverse treatment that was not explicitly sex-based was, nevertheless, suffered on account of sex. The presentation of this circumstantial evidence of discriminatory intent would normally follow the burden-shifting framework familiar to Title VII cases, under which, even if the plaintiff succeeds in presenting a prima facie case of discrimination, the defendant may rebut that presumption by articulating a legitimate, nondiscriminatory reason for the employment action, see *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), causing the presumption to "simply drop[ ] out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

By virtue of the sex-based comments made by Captain Kissik, written in an official police ledger, and displayed on a poster advertising a police event, a reasonable jury could infer that the other abuse Raniola suffered was also on account of sex. We have held that prior derogatory comments by a co-worker may permit an inference that further abusive treatment by the same person was motivated by the same sex-bias manifested in the earlier comments. *See Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir.2000). In *Howley*, the plaintiff presented evidence of sex-based derogatory comments made by a co-worker during a meeting. Afterwards, the same co-worker was insubordinate toward the plaintiff, made false statements undermining her authority, and created safety hazards endangering her. *Id.* at 148–49. The district court granted the defendants' motion to dismiss the hostile work environment claim, holding that a single incident of verbal harassment was insufficient to create a hostile work environment. *Id.* at 149. We vacated the dismissal, finding that given the contents of the derogatory comments, "a factfinder would be entitled to infer that any harassment [the co-worker] directed at [the plaintiff after the verbal abuse] was gender-based." *Id.* at 156; *see also Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3d Cir.1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.... What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents.") (internal quotation marks omitted).

Raniola presented evidence that she was subjected to derogatory remarks by Captain Kissik on two occasions, that another derogatory comment was written over her name in an official police ledger, and that she and another female officer were subjected to derogatory comments on a poster at the precinct advertising a police event. Moreover, Raniola has proffered evidence that Capt. Kissik had singled Raniola out for abuse, and that her name appeared on the NYPD Chief of Personnel's "hit list," to be terminated. With this background, a factfinder could reasonably infer that the other adverse treatment described by Raniola was suffered on account of sex.

In addition, the circumstances surrounding Kissik's imposition of Raniola's work quotas support an inference that Raniola was given more demanding assignments on account of sex. Captain Kissik imposed inordinately high work quotas on Raniola at the moment he approved Raniola's request to be partnered with Kim Swinton, a female officer who also had been administratively transferred to the 50th precinct. Raniola testified that Kissik explained, "if you want to work with [Swinton], you both have to give me 25 [moving violations] and 25 [parking violations a month], but I am telling you now that the department believes in guilt by association[;] it's like a marriage and you're going to have the same reputation that she has, but if that's what you want to do, it's your funeral, I can kill two birds with one stone." When Raniola asked why Kissik had imposed

upon them higher quotas "than everyone else," Kissik replied, "[b]ecause you're criminal, that's why, both of you." Although Kissik's description of Raniola and Swinton as "criminals" may have referred to the fact that both had been administratively transferred to the 50th precinct based on their history of disciplinary problems, the fact that the quotas imposed on the two female officers were higher than those imposed on other officers who had been administratively transferred to the 50th precinct would permit a reasonable jury to infer that the hostility expressed toward the female officers was based on the officers' sex, and not their disciplinary records.

On appeal, defendants argue that Raniola "offered no admissible, nonhearsay evidence" that male officers who had been administratively transferred into the 50th precinct had received the sort of tour changes that Raniola had been denied. The district court did, however, admit into evidence Raniola's testimony as to this precise fact. Defendants describe the denial of Raniola's request for a back-to-back tour as "minimal," label her assignment to "strike post" foot patrols as "de minimis," and claim that Raniola failed to offer any comparison to the assignment of male officers to these patrols. Raniola testified, however, that these patrols were normally given to the most junior members of the squad and she and her female partner, who were twice assigned to these patrols, were the most senior officers on their shift. Defendants offered no explanation whatsoever for why Raniola and her female partner received the highest work quotas of anyone in the 50th precinct, a difficult geographical assignment, and taxi and bus inspections. Defendants' failure to provide a non-discriminatory reason for the harms alleged may add to the evidence that abuse was motivated by discrimination. *Reeves*, 120 S.Ct. at 2108 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional dis-

crimination, and it may be quite persuasive.").

Viewing the totality of the evidence, we conclude that the question of whether Raniola's treatment was due to her being a woman should not have been decided on a motion for judgment as a matter of law. When, as here, the evidence was legally sufficient to permit a reasonably jury to resolve the question in favor of Raniola, this issue of fact should have been decided by the jury.

## C.  Retaliation

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [an employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.2000e–3(a). *Cf. Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999) ("[A] plaintiff need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law.") (internal quotation marks and alteration omitted).

The district court rendered judgment as a matter of law for defendants on Raniola's retaliation claim in reliance upon police administrative findings that there was legitimate cause for Raniola's suspension, probation, and dismissal. Before turning to the merits of Raniola's retaliation claim, we first address the issue of whether these prior administrative findings have a preclusive effect on Raniola's Title VII retaliation claim.

### 1.  The Preclusive Effect of Prior Administrative Findings

The Supreme Court has held that Congress, in enacting Title VII, generally in-

tended to eliminate the binding effect of prior administrative findings and provide a *de novo* trial on Title VII claims. *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 795, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). The only exception to this rule is where an administrative finding is challenged and decided in state court resulting in a state court judgment on the same claim or issue. Under the Full Faith and Credit Clause's federal implementing statute, the federal courts give the same preclusive effect to a state court judgment that it would have in the same state court. U.S. Const. art. IV, § 1; 28 U.S.C. § 1738.

■ Federal law dictates, therefore, the exact *opposite* result urged by counsel for defendants at oral argument. Counsel for defendants argued that, because Raniola had failed to avail herself of the opportunity to challenge her discharge in a proceeding in New York State court, Raniola was now burdened by a conclusive finding that she was discharged for cause and not due to discriminatory retaliation. In fact, an administrative finding concerning her termination could have preclusive effect on her Title VII claim in federal court only if Raniola had unsuccessfully sought to contest her discharge through review in the New York state courts leading to a judgment on the same claim or issue. This she did not do. Consequently, she is not bound by the police department's determination. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 470 n. 7, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) ("Since it is settled that decisions by the EEOC do not preclude a trial *de novo* in federal court, it is clear that unreviewed administrative determinations by state agencies also should not preclude such review even if such a decision were to be afforded preclusive effect in a State's own courts.").

2. The Relevance of Prior Administrative Findings Within Title VII's Burden Shifting Framework

Although it may have no preclusive effect in a subsequent Title VII suit, a prior administrative finding may supply a non-discriminatory reason for an employment discharge under the familiar *McDonnell Douglas* burden-shifting framework, after Raniola has, as here, established a prima facie case of retaliation.

■ To establish a prima facie case of retaliation, a plaintiff must show that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000) (internal quotation marks omitted). The plaintiff's burden at the beginning of the case is a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980). In this case, the district court tacitly agreed that Raniola's filing of an EEOC complaint in July 1995 was a protected activity and that Raniola's subsequent termination in September 1996 was an adverse action. Raniola testified that the EEOC notified Captain Kissik of Raniola's July 1995 complaint within three business days of its filing, and that Sergeant Burgess informed Raniola that Kissik had received a copy of the EEOC complaint. Therefore, Raniola has established a prima facie case of discriminatory retaliation.

The district court failed to consider evidence of Raniola's other protected activities. Raniola's 1987 EEOC complaint and May 1995 internal police complaint also qualify as activities protected from retaliation by Title VII. *See Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir.1992) (finding internal complaint to company management was protected under Title VII, noting that "Congress sought to protect a wide range of activity in addition to the filing of a formal com-

plaint") (internal quotation marks omitted). Raniola clearly alleged in her July 1995 EEOC complaint that she was "discriminated against [inter alia] . . . in retaliation for having filed a charge of sexual harassment with the EEOC in 1987 and signing an agreement in 1989 and/or for making a [May 1995] complaint with the Bronx Inspections's unit (which was forwarded to the Chief of Patrol's office)." Raniola also repeated general allegations of retaliation in her complaints filed in federal court.

■ Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action. *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). Raniola's administrative termination allegedly for cause from the NYPD provides a legitimate, non-discriminatory reason for her discharge. The burden shifts, therefore, back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.

### 3. Proving Retaliation

■ A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, *see Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993), or when there were other objectively valid grounds for a discharge. *See DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 116, n. 8 (2d Cir.1987) ("In the event . . . that appellees were motivated by retaliatory animus in instituting [state administrative proceedings against the plaintiff], Title VII would be violated even though there were objectively valid grounds for the proceeding and the resulting discharge."). A retaliatory motive must be, however, "at least a 'substantial' or 'motivating' factor" behind the adverse action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see also De-*

*Cintio*, 821 F.2d at 115 ("Even if there were no dispute as to the impropriety of [the plaintiff's] conduct, the evidence of retaliatory animus on the [defendant's] part would suffice to defeat the summary judgment motion.").

■ A plaintiff may prove that retaliation was a "substantial" or "motivating" factor behind an adverse employment action either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000). Under some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination. *Reeves*, 120 S.Ct. at 2109.

### 4. Raniola's Proof of Retaliation

■ Viewing the evidence in the light most favorable to Raniola and drawing all reasonable inferences in her favor, we conclude that there was sufficient proof for a reasonable jury to find that her suspension, probation, and termination were carried out in retaliation for her complaints of discriminatory treatment. Although Raniola's suspension, probation, and termination occurred after she was transferred out of Captain Kissik's command in the 50th precinct, Capt. Kissik's role in prosecuting her charges, the timing of the prosecution, and the surrounding events all lend support to Raniola's retaliation claim.

On July 11, 1995, Raniola filed her EEOC complaint. A few days later, Kissik addressed the officers after roll call. Raniola was the only woman present in the room. Kissik announced, "listen up everybody, we have a problem. There is an investigation going on in the precinct and

there is a rat here in the precinct. Until I get rid of her, we are all in this together, so everybody watch what you are doing."

■ On July 18, 1995, one week after Raniola had filed her EEOC complaint, Kissik called Raniola into his office. There, he informed her of three actions he was taking. First, Kissik stated that he was going to change Raniola's performance evaluation to state that her work fell below departmental standards. To justify this action, Kissik explained that he believed that Raniola had fraudulently claimed to be injured in a June 10, 1995 automobile accident following which Raniola had taken a few days of sick leave. Raniola presented evidence, however, to show that Kissik's accusation was pretextual. After a car had struck the police car Raniola was driving, she was taken to the hospital, examined, and released with a note from the emergency room doctor she was to deliver to the police health services. Sergeant Hopkins investigated the accident and told Raniola not to report to work.[11] Police health services instructed Raniola not to report for duty for three days, the same period recommended by the doctor who had examined her in the hospital emergency room. Based upon this evidence, a reasonable jury could conclude that Kissik's proffered reason for altering Raniola's performance evaluation was pretextual.

The second action Kissik informed Raniola that he was taking at their July 18, 1995 meeting was to transfer her from the 50th precinct to the 112th precinct. Raniola's 1995 mid-year performance evaluation stated that "a change of command will be more than beneficial for both officer and Department," and discussed complaints that Raniola "constantly refuses to adhere to department guidelines and policies," and was unable to work with her peers. Raniola, recognizing the ongoing tensions between her and Kissik, had previously requested a transfer out of the 50th precinct. Raniola had secured the assurance of supervisors of the Bronx Task Force that they would accept her if Kissik would authorize her transfer. According to Raniola's testimony, when she brought the transfer request to Kissik for his signature, he "crumpled it up" and told her, "I am not signing shit for you." Kissik's sudden interest in Raniola's transfer, following directly after the filing of Raniola's EEOC complaint, together with the other evidence presented, would permit a reasonable jury to conclude that the proffered reason for Raniola's transfer was pretextual and support the inference that Kissik sought to transfer Raniola to obscure his role in her later termination.

Last, Kissik informed Raniola that she was going to be charged in an administrative proceeding for missing two traffic court appearances and for not properly securing a prisoner's camcorder that was later found to be missing. Capt. Kissik and Lt. Leissler conducted the investigation of these charges. On August 14, 1995, Raniola was called back to the 50th precinct to be charged. As a result of being found guilty of these charges, she was suspended for 30 days beginning January 9, 1996, and placed on dismissal-probation

11. Raniola unsuccessfully attempted to admit into evidence her line of duty injury report in which Sergeant Hopkins recommended the designation of her injury as "line of duty," a recommendation that Captain Kissik subsequently vetoed. Concerning the admissibility of the report, the district court ruled there was "too much ambiguity in the recommendation and too little indicia of reliability to allow me to in effect create an imprimatur of the liability [on] what was the opinion of Sergeant Hopkins." The district court erred in not admitting this document into evidence on this ground. While the report may certainly have been "prejudicial" to Captain Kissik, under Fed.R.Evid. 403, evidence must be *unfairly* prejudicial in order to be excluded from evidence. *See Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 151 (2d Cir.1997) ("Although any evidence that tends to establish liability is prejudicial to the interests of the defendant, the prejudice is unfair only if the evidence has 'an undue tendency to suggest decision on an improper basis.'") (quoting Fed.R.Evid. 403 advisory committee notes (1972)).

until February 10, 1997. Once placed on dismissal-probation, also termed termination-probation, the NYPD could terminate Raniola without a hearing if she violated any of the terms of her probation. Upon leaving the hearing room, after being charged, Raniola saw Kissik waiting outside. There, Kissik told Raniola, "I got you now, Raniola, you can kiss your job goodbye because you're going down." Proffered testimony from Sergeant Burgess was to have established that Kissik had told him "to single out Patricia Raniola for discipline, for a heavier workload, [and] occasionally for undesirable assignments," and that Kissik ordered Burgess to give Raniola "a hard time and force her to quit." Burgess was also to testify that he met with Raniola after she filed her EEOC complaint and told her that "Kissik knows about your EEOC complaint and you better withdraw it." After Raniola said she would not withdraw it, Burgess told her that "the shit's going to hit the fan; somebody is going to lose their job over this and it's not going to be me." In addition, Lt. Leissler had previously told Raniola that "if you make a formal complaint and bring it to the EEO of the precinct … Kissik will make your lives more miserable than they already are," because, "[i]t would bring an investigation in the precinct and [Kissik does not] want that."

Raniola proffered that testimony from Chief of Personnel Michael Markman would describe that his "good friend Anthony Kissik" wanted Raniola off the police force, and that Markman thought Raniola "should be gotten rid of." [12] Daniel Figueroa's testimony was proffered to indicate that the NYPD maintained a "list of officers who, should their names come up in any discipline, were to be severed from the police department if at all possible,"

known as "Chief Markman's hit list," and that Raniola's name appeared on that list. Figueroa, who worked at the department's advocate's office, was given Raniola's case when the incident at Gloria Gonzalez's house arose, and, according to the proffer, was assigned to "draw[ ] up the charges that would get [Raniola] thrown out of the department forthwith." Figueroa resisted doing so, because he did not feel that "the allegations, even if true, were serious enough to get her thrown out." He then learned "that she was supposed to be thrown out." Chief Markman prepared the final recommendation to dismiss Raniola from the NYPD that resulted in her termination.

Proffered testimony was also to have established that despite the fact that Sergeant Beth Coleman, the integrity control officer of the 112th precinct, had originally "let it be known that the department was looking to fire [Raniola]," Sergeant Coleman later admitted that she had been wrong about Raniola and thought that Raniola "was basically a good cop." Significantly, Raniola's full year evaluation for 1995, which covered Raniola's last half year at the 50th precinct and her first half year at the 112th precinct, and was filled out by officers at the 112th precinct, mentions none of the problems Kissik had cited in his 1995 mid-year evaluation and concluded that Raniola performed above departmental standards.

Finally, both Raniola's testimony and the proffered testimony of Gloria Gonzalez suggested that Raniola had not made the comment, "Fuck those guys from IAB," for which Raniola was terminated. Viewed in the light most favorable to Raniola, this evidence would allow a reasonable jury to find that the NYPD's justification

---

12. Raniola was prepared to call Chief Michael Markman to testify as to a conversation he had with Adam Alvarez, whom Raniola also had wanted to call to testify. The district court had ruled, according to plaintiff's counsel, that Alvarez would not be permitted to testify. We have nothing in the record to explain why the district court may have made such a ruling in light of the fact that Alvarez's testimony would appear to have been relevant, probative, and admissible.

for Raniola's termination was a pretext for discrimination.

The evidence in the record and Raniola's proffers of testimony from the witnesses she was prepared to present provide a sufficient basis for a reasonable jury to find that retaliation was a substantial or motivating factor behind Raniola's suspension, probation, and termination.

## D. Discovery

On appeal, Raniola claims that the district court improperly limited the number of depositions that she was permitted to take of both party and non-party witnesses. The docket sheet indicates that deadlines for discovery were reset various times between 1997 and 1999, following which further delay was caused by the withdrawal of Raniola's counsel and the substitution of new counsel. Raniola states that at an August 27, 1999 pre-trial conference, the district court limited Raniola to three depositions prior to trial, and that after defendants failed to produce one of the subpoenaed witnesses, the court reduced the number of permitted depositions to two.

The federal rules provide that leave of the court is required when a request would result in the taking of more than ten depositions, Fed.R.Civ.P. 30(a)(2)(A), but also state that "[b]y order or by local rule, the court may alter the limits in these rules on the number of depositions and interrogatories." Fed.R.Civ.P. 26(b)(2). The same rule provides several discretionary factors to be weighed in imposing these limits. *See id.*

The record before us does not permit us to rule on Raniola's claim that discovery was impermissibly limited. Outside of the few docket entries already referred to, we have not been provided with any evidence upon which to determine whether Raniola's claims of impermissible limitations on discovery are true, and if so, what factors the district court used in establishing these limitations, whether any

objection to these limitations was preserved below, and whether the imposition of these limitations was an abuse of the court's discretion. *See Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 937 (2d Cir.1998) (reviewing discovery rulings for abuse of discretion).

Upon remand for a new trial, however, it would seem appropriate for the district court to consider reopening discovery to permit Raniola to take a reasonable number of depositions given the number of individuals implicated in the allegations that Raniola makes.

## CONCLUSION

We review the district court's grant of defendants' motion for judgment as a matter of law to find only whether, viewing all of the evidence in the light most favorable to Raniola and drawing all reasonable inferences in her favor, a reasonable jury could have arrived at a different conclusion than did the district court. The evidence which Raniola presented and the additional witness testimony that Raniola proffered provide a sufficient basis for a reasonable jury to conclude that Raniola was subjected to a hostile work environment because she was a woman and that Raniola was suspended, put on probation, and then terminated in retaliation for having complained of her treatment. We therefore vacate the judgment dismissing Raniola's hostile work environment and retaliation claims and remand these claims, with Raniola's pendent state and municipal law claims, for retrial.