**Brien O'HAZO, Plaintiff,**

v.

**BRISTOL–BURLINGTON HEALTH DISTRICT, Defendant.**

**No. 3:06CV00064 (DJS).**

United States District Court,
D. Connecticut.

Feb. 12, 2009.

---

Dawne Westbrook, East Glastonbury, CT, for Plaintiff.

Gabriel Joseph Jiran, Lisa Banatoski Mehta, Shipman & Goodwin, Hartford, CT, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Brien O'Hazo ("O'Hazo"), brings this action against the defendant, Bristol–Burlington Health District ("the Health District"), alleging that he was unlawfully discriminated and retaliated against because of his sex and his age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), the Age Discrimination in Employments Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA"), and the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. §§ 46a–60 et seq. ("CFEPA"). Now pending before the Court is the Health District's supplemental motion for summary judgment (dkt. # 43).[1] For

1. On October 31, 2007, the Health District filed the original motion for summary judgment (dkt. # 29) as to the original complaint, which was filed on January 13, 2006. On April 7, 2008, O'Hazo filed an amended complaint. On June 10, 2008 the Health District filed a supplemental motion for summary judgment (dkt. # 43) as to the amended complaint. Accordingly, because the amended complaint is the operative complaint, and be-

reasons that hereafter follow, the Health District's supplemental motion for summary judgment (**dkt. #43**) is **GRANTED.**[2]

## I. FACTS

The amended complaint sets forth legal theories that rely on a variety of incidents that have not been pled. The parties generally stipulate to these incidents in their memoranda. Accordingly, the following facts have been derived from the Local Rule 56(a) Statement of Material Facts and all of the memoranda submitted in support of and opposition to the motion for summary judgment.

O'Hazo was born on March 17, 1946. In 1990, he began working for the Health District as a sanitarian. O'Hazo was employed by the Health District for sixteen years and held the same position until the Health Department terminated his employment on December 15, 2006. He was one of the few males employed by the Health District. When the Health District hired O'Hazo, Francis Bartucca ("Bartucca") was the supervisor for him and his co-worker, Phyllis Amodio ("Amodio"). Bartucca, in his capacity as O'Hazo's supervisor, criticized or directed O'Hazo's work on occasion.

In 1995, Amodio was promoted to the position of Chief Sanitarian and became O'Hazo's supervisor. One-and-a-half or two years after Amodio's promotion, O'Hazo discovered that Amodio was finding things to criticize him for without bringing them to his attention. O'Hazo claims that he received more critical evaluations from Amodio than from Bartucca. O'Hazo also claims that he was treated differently from his similarly situated younger, female co-worker, Karen Wagner ("Wagner"), in that she was not subjected to the same scrutiny and harassment to which he was subjected. O'Hazo had six years of seniority over Wagner, who was born on January 31, 1965. O'Hazo and Wagner shared food service responsibilities and, initially, the alphabet of food servers was equally divided so that O'Hazo visited fifty percent of food servers and Wagner visited the other fifty percent.

O'Hazo further claims that the Health District's Director of Health, Patricia Checko ("Checko"), and Amodio have engaged in a series of disciplinary actions which amounted to a "litany of discipline." Numerous memoranda and detailed notes and documents regarding these disciplinary actions were kept in O'Hazo's personnel file and in a separate "supervisor's" file. O'Hazo believes that both files con-

cause the Court assumes that the parties incorporated their original summary judgment arguments into the supplemental summary judgment motion and opposition, the original motion for summary judgment (**dkt. #29**) is **DENIED as moot.** Nonetheless, the Court has considered the arguments from the original summary judgment submissions.

**2.** In the amended complaint and the 26(f) Status Report, O'Hazo claims that he was subjected to a hostile work environment. The memorandum in support of the motion for summary judgment addresses the hostile work environment claim. O'Hazo's opposition memoranda, however, do not brief this claim. Therefore the Court deems this claim

to be abandoned. *See Ludwiczak v. Hitachi Capital Am. Corp.*, 528 F.Supp.2d 48, 59 (D.Conn.2007) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). Moreover, there is nothing in the record indicating that he was subject to comments based on age or gender by anyone within the Health District, i.e., the alleged misconduct can not be considered sufficiently severe or pervasive to satisfy a hostile work environment claim. Thus, with regard O'Hazo's hostile work environment claim, the motion for summary judgment (**dkt. #43**) is **GRANTED.**

tained information misrepresenting various events, and that many of the incidents were documented for the purpose of building a disciplinary history sufficient to terminate his employment.

O'Hazo and the Health District stipulate to the following events, which, according to O'Hazo, each represents a disciplinary action taken against the Health District. For the purpose of clarity, the Court has numbered each event and placed it in chronological order.

(1) In May or June of 2000 [3], O'Hazo was criticized by Checko for "not being a team player" ("the Team Player Meeting");

(2) On May 5, 2000, O'Hazo was called into a meeting with Checko, Amodio, and the restaurant owner of the Cacti Restaurant ("the Cacti Restaurant Meeting"). The Cacti Restaurant Meeting resulted from O'Hazo's involvement in an incident at the Cacti Restaurant. O'Hazo had been scheduled to perform an inspection during the Mexican holiday, Cinco de Mayo. The restaurant owner, however, did not want the food inspection performed that day, and a discussion between the owner and O'Hazo escalated to the point where O'Hazo felt threatened by the owner. The owner filed a complaint with the Health District. Although O'Hazo agrees that it was not inappropriate for Checko to hold a meeting under those circumstances, he maintains that the inspection was part of his duty, that he did nothing wrong at the Cacti Restaurant, and that he was interrogated on this incident for two hours;

(3) In October 2001, O'Hazo was called into a meeting with Checko, Amodio, and the restaurant owner of Cosmos Restaurant ("the Cosmos Restaurant Meeting").

The Cosmos Restaurant Meeting resulted from O'Hazo's involvement in an incident at the Cosmos Restaurant. The restaurant owner claimed that O'Hazo had harassed him and was abusive to him. While O'Hazo agrees that it was not unreasonable for Checko and Amodio to question him when they received a complaint from the public, he maintains that this was an extensive interview, the basic premise of which was that he was guilty of some wrongdoing. O'Hazo also claims that the Health District solicited adversarial information from the restaurant owner;

(4) In December 2001, O'Hazo was called into a meeting with Checko, Amodio and a union representative and was criticized for his conduct during a lead inspection ("the Barbara Road Lead Meeting"). This meeting was a follow-up to a letter that Checko received from a representative from the State Health Department stating that O'Hazo did not know how to perform lead inspections. O'Hazo claims that although he is a certified lead inspector, he has had limited lead experience and exposure, and he believed that State Health Department employees were available to perform lead inspections as part of their job;

(5) On August 29, 2002, Amodio criticized O'Hazo for failing to complete basic information in the inspection report for a lead inspection ("the Prospect Street Lead Inspection"). Amodio wrote a memorandum to Checko expressing her concerns. O'Hazo maintains he did not fill out the paperwork correctly because Amodio was not clear in her instructions, and because O'Hazo lacked experienced in this area and was not sensitive to the level of difficulty he would have in transposing the information to the required forms;

**3.** Many of the incidents mentioned by O'Hazo do not correspond to a specific date, but to a month and year, or to a year only.

(6) In March of 2003, O'Hazo was called into a meeting with Amodio and Checko to explain why he interrupted an Asian food cooking class ("the Asian Cooking Class Meeting"). This meeting was a follow up to a memorandum Amodio sent to Checko, expressing that O'Hazo's behavior in interrupting an Asian food cooking class was allegedly "inappropriate and insubordinate." O'Hazo maintains that he should not have been reprimanded for this incident. He claims that he had a right to be at the class because he frequently inspected the facilities. Furthermore, O'Hazo claims that it was appropriate for him to share important information about hand washing and sanitary practices;

(7) In March 2003, O'Hazo was called into a meeting with Checko and a union representative to respond to allegations against him of harassing and scaring the staff at the Burlington Inn ("the Burlington Inn Meeting"), following a complaint from the owner. O'Hazo claims that Checko should not have called him into this meeting because he was inspecting a building where the Burlington Inn was catering an event, and he was doing this on his own time and in the capacity of a part-time contractor for the Town of Plainville. O'Hazo further claims that Checko solicited adversarial information from the Burlington Inn to put in his supervisory file;

(8) In September 2003, O'Hazo was initially denied compensatory time to go to a meeting at the Worker's Compensation Commission ("the Compensatory Time Denial Meeting"). Specifically, he claims that he was only permitted compensatory time to attend the meeting when a union representative approached Checko about allowing O'Hazo to attend the meeting. Checko maintains that she initially denied the request because she thought it was inappropriate for O'Hazo to attend the meeting while on work time, but when O'Hazo insisted, she allowed him to attend during work time while being paid by the Health District;

(9) On December 29, 2003, O'Hazo received a supervisory memorandum ("the December Supervisory Memorandum") from Amodio regarding a report that O'Hazo had written about septic failures and complaints. In the December Supervisory Memorandum, Amodio wrote, "Your listing on 'New System' was confusing and misleading.... Once you return to work you will be given a time frame to complete this assingment [sic]." (Dkt.# 29, Ex. A, Pt. 7.) O'Hazo maintains that this was an unnecessary disciplinary action because this was the first time he had been asked to complete the report, and it was unfair of Amodio to criticize him in writing for the mistakes he made;

(10) Sometime in 2004 and 2005, O'Hazo was called into a meeting and criticized for not performing some of his duties related to the Giamatti Little League Complex ("the Giamatti Little League Complex Meeting") during the period of January 2004 through June 2005. O'Hazo claims that this was a work prioritization issue, and he was planning on completing the duties at a later date;

(11) Sometime in 2004 and 2005, O'Hazo sought to become union steward but was ruled out ("the Union Steward Denial"). It is O'Hazo's belief that he was ruled out because: (a) he had a pending CHRO complaint against his employer; and (b) his direct supervisor, Amodio, was President of the union;

(12) O'Hazo claims that overtime opportunities were unfairly distributed by the Health District ("the Unfair Overtime Distributions"). O'Hazo maintains that Amodio would keep overtime opportunities for herself and only offer last minute overtime slots to he and his co-worker, Wagner.

Often, he would not be available to take the overtime because of short notice. O'Hazo admits, though, that he received more overtime opportunities than Wagner because he was better positioned to take the last minute overtime offered by Amodio;

(13) O'Hazo was involved with an incident in June 2006 when he was criticized for his actions at Century Buffet ("the Century Buffet Incident"). A representative of the State Health Department informed the Health District that O'Hazo had failed to check a shipper's list related to the shellfish that was being used at the Century Buffet. A customer of Century Buffet became sick after eating the shellfish. The Health District issued O'Hazo a written reprimand, along with three of his female co-workers, including Amodio and Wagner. Because the Health District found that Wagner had no direct involvement in the inspection (unlike O'Hazo, who was in charge of the inspection), her written reprimand was later reduced to a verbal reprimand;

(14) On December 15, 2006, the Health District terminated O'Hazo's employment. O'Hazo claims that his termination was motivated by retaliatory and discriminatory animus. The Health District claims that O'Hazo was terminated because of work performance issues:

> The plaintiff has violated general principles regarding acceptable work performance and acceptable workplace conduct that prohibit insubordination and require courteous and respectful treatment of co-workers and staff members. Furthermore, the Plaintiff has failed to properly carry out the duties of his position as a Registered Sanitarian as ... exhibited by poor work quality and performance issues. These expectations and principles were communicated to him orally in discussions with his super-

visor(s) as well as during staff meetings. He has also violated general Health District office procedures that have been orally communicated to the Plaintiff by his immediate supervisor on several occasions. In addition, he has violated procedures of the Health District relating to the filing of orders and affidavits, such as a policy dated February 27, 1999, requiring the Chief Sanitarian's review of such documents prior to finalization and submission of them to the Director of Health.

(Dkt. # 29, Ex. D.)

## II. DISCUSSION

The Health District argues that summary judgment must be entered because O'Hazo has not established the elements of either his age and sex discrimination clams or his retaliation claims. In contrast, O'Hazo asserts that summary judgment must be denied because he has sufficiently demonstrated age and sex discrimination, and retaliation. The Court shall address the parties' arguments seriatim.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] face with respect to which [it] has the burdens of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party to demonstrate the absence of any material

factual issue genuinely in dispute." *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (internal quotation marks omitted).

A dispute concerning a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (internal quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. PROCEDURAL HISTORY

Prior to determining the merits of the case it is necessary for the Court to review the procedural history behind the parties and their filings.

On March 2, 2004, O'Hazo filed a complaint with the state of Connecticut Commission on Human Rights and Opportunities ("CHRO") ("2004 CHRO Complaint") and the Equal Employment Opportunity Commission ("EEOC") ("2004 EEOC Complaint") (together, "2004 Administrative Complaints") alleging that his boss at the Health District engaged in a variety of discriminatory acts based on his age and sex.

On July 21, 2005, O'Hazo filed an amended complaint with the CHRO and the EEOC (together "2005 Amended Administrative Complaints"). The 2005 Amended Administrative Complaints add-ed the additional allegation that O'Hazo suffered a retaliatory action when he was denied his bid to become union steward. For the purpose of simplicity, when considering the allegations in the 2004 Administrative Complaints and the 2005 Amended Administrative Complaints together, the Court will refer to these as "the Original Administrative Complaints."

Sometime between January 1, 2006 and January 13, 2006, O'Hazo received the release of jurisdiction from the 2004 CHRO Complaint ("right-to-sue letter").[4] On July 26, 2007, O'Hazo obtained the right-to-sue letter from the 2005 Amended CHRO Complaint and on October 22, 2007 the EEOC sent O'Hazo a dismissal and a right-to-sue letter. Based on these letters, O'Hazo filed the original complaint with the Court on January 13, 2006.

On October 31, 2007 the Health District filed a motion for summary judgment as to each claim in the original complaint. Attached to the motion was a memorandum in support, a Local Rule 56(a)(1) Statement of Material Facts, and a manually filed set of seven exhibits.

On December 27, 2007 O'Hazo filed a memorandum in opposition to the motion for summary judgment and Local Rule 56(a)(2) Statement of Material Facts. In his opposition memorandum, O'Hazo argued that his claims are also based on his termination, which occurred on December 15, 2006. As a result of the termination, O'Hazo filed another complaint with the CHRO on January 24, 2007 alleging retaliation ("2007 Administrative Complaint"). O'Hazo's termination, however, occurred after he had filed the original complaint in this case.

---

**4.** Neither the request nor the right-to-sue letter has been enclosed as an exhibit in this case. Thus, while the exact date is unclear, the right-to-sue letter must have been issued sometime between January 1, 2006 and January 13, 2006. In addition, there is no mention of when O'Hazo received the right-to-sue letter from the 2004 EEOC Complaint.

On April 7, 2008, the Court held a telephonic conference to resolve the issue of whether O'Hazo's termination could be decided on the motion for summary judgment, which was based on the facts alleged in the original complaint. Since the filing of the original complaint preceded the termination, the Court directed the parties to file an amended complaint and answer, to conduct five more weeks of discovery, and to file supplemental memoranda to the motion for summary judgment. (*See* dkt. # 38.) O'Hazo filed the Amended Complaint on April 7, 2008.

On June 10, 2008 the Health District filed a supplemental motion for summary judgment along with a memorandum in support and exhibits. In response, O'Hazo filed a supplemental opposition to the motion for summary judgment and attached a Local Rule 56(a)(2) Statement of Material Facts.

## C. CLARIFYING O'HAZO'S CLAIMS

There is a some ambiguity surrounding O'Hazo's allegations, facts, and the time line to which the allegations and facts pertain. Thus, it is necessary to set forth each claim and explain the applicable facts to that claim.

The original complaint contains five sections entitled: "I. Preliminary Statement," "II. Jurisdiction," "III. Parties," "IV. Statement of Claims," and "V. Prayer for Relief." The Preliminary Statement section explains three counts: Count One, a Title VII claim based on discriminatory acts that allegedly occurred because of O'Hazo's gender and in retaliation for

O'Hazo's prior opposition to the Health District's discriminatory practices (i.e. the filing of the Original Administrative Complaints); Count Two, an ADEA claim based on discriminatory acts that allegedly occurred because of O'Hazo's age; and Count Three, a CFEPA claim based on discriminatory acts that allegedly occurred because of O'Hazo's age and gender, and in retaliation for O'Hazo's prior opposition to the Health District's discriminatory practices (i.e. the filing of the Original Administrative Complaints).[5]

The allegations in Count One are derived from the Original Administrative Complaints. The 2004 Administrative Complaints allege a series of scrutiny, disciplinary actions, and criticism from his female boss at the Health District. The 2005 Amended Administrative Complaints allege that O'Hazo was denied the position of union steward in retaliation for filing the 2004 CHRO Complaint. The amended complaint adds an allegation that O'Hazo was terminated by the Health District. Accordingly, the Court interprets the amended complaint as containing the following claims:

(1) a Title VII sex discrimination claim based on: (a) the Health District's discriminatory treatment of O'Hazo; and (b) O'Hazo's termination;

(2) a Title VII retaliation claim based on: (a) the Health District's denial of the union steward position to O'Hazo, allegedly because he filed the 2004 Administrative Complaints; and (b) O'Hazo's termination,

---

**5.** The Statement of Claims section, while generally explaining the Counts in the Preliminary Statement section, also adds an allegation that Count One is to include a claim for age discrimination: "[t]he [Health District] is discriminating against the plaintiff because of his gender, age and in retaliation for his previous opposition to discriminatory practices."

(Dkt. # 1 ¶ 39.) Count One, however, is a Title VII claim, and Title VII is not the proper federal statute with which to allege age discrimination. The ADEA is the proper vehicle for such age-based claims, and the Court shall construe any age discrimination allegations to be brought under the ADEA (or its counterpart under Connecticut law).

allegedly because he filed the Original Administrative Complaints;

(3) an ADEA age discrimination claim based on: (a) the Health District's discriminatory treatment of O'Hazo; and (b) O'Hazo's termination;

(4) an ADEA retaliation claim based on: (a) the Health District's denial of the union steward position to O'Hazo, allegedly because he filed the 2004 Administrative Complaints; and (b) O'Hazo's termination, allegedly because he filed the Original Administrative Complaints;

(5) a CFEPA sex discrimination claim based on: (a) the Health District's discriminatory treatment of O'Hazo; and (b) O'Hazo's termination;

(6) a CFEPA age discrimination claim based on: (a) the Health District's discriminatory treatment of O'Hazo; and (b) O'Hazo's termination; and

(7) a CFEPA retaliation claim based on: (a) the Health District's denial of the union steward position to O'Hazo, allegedly because he filed the 2004 Administrative Complaints; and (b) O'Hazo's termination, allegedly because he filed the Original Administrative Complaints.

## D. LIMITATIONS ON O'HAZO'S CLAIMS

Given the unique procedural history of this case and the variety of accusations made by O'Hazo, there are limitations that need to be set forth prior to analyzing the substantive claims at bar.

### 1. The Union Steward Denial

■ O'Hazo's retaliation claims are, in part, based on the allegation that he was denied the union steward position. The Court will not consider this allegation because it does not constitute a claim against the Health District, the only named defendant in this action. *See Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375,

393–94, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (holding that an employer does not have an agency relationship with the union and is not responsible for the discriminatory acts of a union against its members). **Accordingly, O'Hazo's retaliation claims are limited to being based on O'Hazo's termination. Therefore, the Health District's motion for summary judgment (dkt. # 43) is GRANTED as to O'Hazo's Title VII, ADEA, and CFEPA retaliation claims insofar as they based on the denial of the union steward position.**

### 2. Time Bar: Administrative Filing Period

The Health District claims that various allegations in the Original Administrative Complaints and the 2007 Administrative Complaint can not be considered because they were not filed within the 300–day administrative filing period. To maintain a federal civil action under Title VII and the ADEA, a plaintiff must timely file a charge of discrimination with the EEOC. 42 U.S.C. § 2000e–5(e); 29 U.S.C. § 626(d); *see Dezaio v. Port Auth.*, 205 F.3d 62, 64–65 (2d Cir.2000); *Harris v. City of New York*, 186 F.3d 243, 247–48 (2d Cir.1999). The charge must be filed with the EEOC within 180 days of the date on which the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5 (e)(1); 29 U.S.C. § 626(d)(1).

The filing deadline for Title VII and ADEA claims is extended to 300 days, however, in those states or localities that have their own anti-discrimination laws and an agency to enforce those laws. 42 U.S.C. § 2000e–5(e)(1); 29 U.S.C. § 626(d)(2); *see Flaherty v. Metromail Corp.*, 235 F.3d 133, 136 n. 1 (2d Cir.2000) (finding that an administrative complaint must be filed within 300 days of the discriminatory act). Connecticut has its own

anti-discrimination agency, so the 300–day limitation applies to O'Hazo's federal claims here. Claims under CFEPA, however, must be filed no more than one 180 days after the alleged act of discrimination. Conn. Gen.Stat. § 46a–82(f).

■ "The timeliness requirement of Title VII is analogous to a statute of limitations.... As such, it is meant to put the adversary on notice to defend within a specified period and to promote the right to be free of stale claims." *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir.2006) (internal citation and quotation marks omitted). A discrimination charge must be filed when the act occurs because "[e]ach discrete discriminatory act starts a new clock for filing charges." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In this case each of the administrative complaints must be examined to determine whether their allegations of discrimination are time barred.

First, O'Hazo's 2004 Administrative Complaints, which alleged sex and age discrimination, were filed on March 2, 2004. Thus, with regard to O'Hazo's federal claims, the discriminatory conduct must have occurred within the 300–day time period, i.e., on or after May 7, 2003. With regard to O'Hazo's CFEPA claims, the discriminatory conduct must have occurred within the 180–day time period, i.e., on or after September 4, 2003. Thus, unless there is an exception to the administrative filing period, the following events cannot be considered for the Title VII, ADEA or CFEPA claims: (1) the Team Player Meeting in May or June 2000, (2) the Cacti Restaurant Meeting in May 2000, (3) the Cosmos Restaurant Meeting in October

2001, (4) the Barbara Road Lead Meeting in December 2001; (5) the Prospect Street Lead Inspection in August 2002; (6) the Asian Cooking Class Meeting in March 2003; and (7) the Burlington Inn Meeting in March 2003.

The following events are timely and can be considered in the Title VII, ADEA and CFEPA claims: (1) the Compensatory Time Denial Meeting in September of 2003;[6] (2) the December Supervisory Memorandum on December 29, 2003; and (3) the Giamatti Little League Complex Incident occurring sometime in 2004 and 2005.

Second, O'Hazo's 2005 Amended Administrative Complaints, which were based on one event (the denial of the union steward position), were filed on July 21, 2005. Although this incident is not barred by the 300–day administrative filing period, the Court shall not consider it because, as noted above, the Health District does not have an agency relationship with the union. *See Gen. Bldg. Contractors Ass'n*, 458 U.S. at 393–94, 102 S.Ct. 3141.

Third, O'Hazo's 2007 Administrative Complaint, which alleged that his December 15, 2006 termination was discriminatory and retaliatory, was filed on January 24, 2007. Upon review of the parties submissions, it appears that O'Hazo relies on two incidents of discriminatory treatment in making this claim: (1) the Unfair Overtime Distributions; and (2) the Century Buffet Incident in June of 2006. O'Hazo provides no specific dates regarding the Unfair Overtime Distributions. The burden here is for O'Hazo to provide this necessary information, and the Court cannot simply assume that the Unfair Overtime Distribu-

---

**6.** As noted above, the cutoff date for O'Hazo's CFEPA claims is September 4, 2003. It is not clear when exactly in September the Compensatory Time Denial Meeting occurred. Be-

cause a finding that this event is timely would not affect the Court's decision, the Court shall consider it to be timely and include it in the substantive analysis.

tions are timely. Therefore, the Court deems these incidents to be barred by the 300–day administrative filing period. As the Century Buffet Incident and O'Hazo's termination both occurred after March 30, 2006, they are not barred by the 300–day administrative filing period.

### 3. Continuing Violation Doctrine

■ According to the continuing violation doctrine, if a plaintiff files an administrative charge that is timely as to any incident of discrimination that is in furtherance of an ongoing policy of discrimination, all claims of discrimination under that policy will be timely. *See Burrowes v. Brookdale Hospital and Medical Center*, 66 Fed.Appx. 229, 231 (2d Cir.2003) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996)). In *Burrowes*, however, the Second Circuit suggested that this doctrine has been, at best, severely limited by the Supreme Court's decision in *Morgan*, and even may not be viable at all. *See Burrowes*, 66 Fed.Appx. at 231.

■ In any event, even if the Court were to apply it here, the continuing violation doctrine generally has been limited to situations where a specific discriminatory policy or mechanism has been alleged. *See Van Zant*, 80 F.3d 708, 713 (2d Cir. 1996); *see also Crosland v. City of New York*, 140 F.Supp.2d 300, 307 (S.D.N.Y. 2001) ("The [continuing violation] doctrine has generally been limited to situations where there are specific policies or mechanisms, such as discriminatory seniority lists or employment tests"). Accordingly, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (internal quotation marks omitted). As noted above, seven of O'Hazo's allegedly discriminatory events are time barred by the 300–day administrative filing period. These claims would not saved by the continuing violation doctrine because O'Hazo failed to set forth a specific discriminatory policy or mechanism. Thus, these claims merely add up to multiple incidents of similar discrimination. As made clear in *Quinn*, this is not enough to sustain a claim that O'Hazo was subject to a continuing violation.

### 4. Time Bar: Filing an Action with the Court

After filing a timely charge with an administrative agency, a Title VII, ADEA, or CFEPA claimant must file his complaint with the court not more than ninety days after receiving a right-to-sue letter. 42 U.S.C. § 2000e–5(f)(1); Conn. Gen.Stat. § 46a–101(e); *see Dawes v. City Univ. of N.Y.*, 193 Fed.Appx. 59, 60 (2d Cir.2006); *Sherlock v. Montefiore Medical Center*, 84 F.3d 522, 525 (2d Cir.1996); *Mulero v. Bridgeport Bd. of Educ.*, No. 3:07CV1206(PCD), 2008 WL 2185928, at *2 (D.Conn. May 22, 2008).

In this case, O'Hazo was terminated on December 15, 2006 and filed the 2007 Administrative Complaint on January 24, 2007. O'Hazo presumably received the right-to-sue letters from the CHRO on July 30, 2007 and from the EEOC on October 25, 2007.[7] Each letter contained

---

7. As the Second Circuit has noted, "it is assumed that a mailed document is received three days after its mailing." *Sherlock*, 84 F.3d at 525; *see* Fed.R.Civ.P. 6(d); *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 148, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). The CHRO issued a right-to-sue letter to O'Hazo on July 26, 2007, and the EEOC issued a right-to-sue letter to O'Hazo on October 22, 2007. Because the actual date of O'Hazo's receipt of the right-to-sue letter is unknown, the Court shall presume that O'Hazo received these documents three days after the administrative agencies mailed

standard language informing O'Hazo that he had ninety days to file a lawsuit or his right to sue would be lost. O'Hazo filed his Amended Complaint on April 7, 2008 adding the allegation of his termination to his claims. As O'Hazo filed the Amended Complaint 253 days after receiving the CHRO right-to-sue letter and 165 days after receiving the EEOC right-to-sue letter, the allegations in the Amended Complaint can not be considered in this action unless an exception applies.

O'Hazo argues that despite his failure to timely file the amended complaint within the ninety day period, he was never required to file the 2007 Administrative Complaint because, under *Butts v. N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401–04 (2d Cir.1993), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Svc. Care*, 163 F.3d 684, 693 (2d Cir.1998), his termination was "reasonably related" to the allegations in the Original Administrative Complaints. The Health District contends that the "reasonably related" exceptions under *Butts* are not applicable to this case and instead that *Brown v. Comm'n on Human Rights & Opportunities*, No. 3:02CV223(CFD), 2008 WL 687358 (D.Conn. Mar. 10, 2008), provides guidance for the outcome of this case.

A district court may hear time-barred Title VII, ADEA or CFEPA claims that are based on conduct subsequent to the administrative charge which is "reasonably related" to conduct alleged in the administrative charge. *Butts*, 990 F.2d at 1401–04; *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir.2003) (extending *Butts'* "reasonably related" rule to ADEA claims "[a]s the administrative exhaustion requirement is the same under the ADEA as it is under Title VII."); *Garris v. Dep't of Corr.*, 170

F.Supp.2d 182, 188–89 (D.Conn.2001) (applying the "reasonably related" analysis to CFEPA claim). There are three types of claims that courts will find are "reasonably related" to the one's asserted in an administrative filing: (1) claims where the conduct complained of would fall within the scope of the administrative investigation; (2) claims alleging retaliation by an employer against an employee for filing an administrative charge; and (3) claims where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the administrative charge. *Butts*, 990 F.2d at 1402–03.

The Court notes at the outset that the Health District has conceded that, under the second exception in *Butts*, the issue of termination can be considered with regard to O'Hazo's retaliation claims. That is, the Health District admits that the Court may consider O'Hazo's termination when analyzing his retaliation claims, regardless of whether O'Hazo filed the amended complaint in a timely manner.

The issue then becomes whether a discrete act of discrimination (i.e., termination), occurring after the timely filing of an administrative complaint alleging discriminatory treatment is reasonably related to the administrative complaint such that it need not be separately exhausted administratively. In the Court's view, O'Hazo's termination was reasonably related to the conduct alleged in the Original Administrative Complaints. As the Supreme Court noted,

The third type of reasonably related claim is where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. Such an incident

them. The Court also has added one more day to the calculation for the CHRO right-to-

sue letter because the third day from its issuance was a Sunday.

might not fall within the scope of the EEOC investigation arising from the charge, since it might occur after the investigation was completed. . . . Howeverer, the values associated with exhaustion are not entirely lost because the EEOC would have had the opportunity to investigate, if not the particular discriminatory incident, the method of discrimination manifested in prior charged incidents. *Butts*, 990 F.2d at 1402–03. On the administrative affidavit form of his 2004 CHRO Complaint, O'Hazo checked that he was warned and harassed because of his gender and his age. Moreover, in the factual allegations of this administrative affidavit, O'Hazo stated the following: "I believe that my being warned and harassed is directly related to my age and my gender. . . . I believe that Phyllis Amodio has scrutinized my work for the past several years, in order to try and [sic] terminate my employment. . . ." (Dkt. # 29, Ex. D.)[8]

■ Indeed, the Health District's reasons for terminating O'Hazo included his disregard of "general principles regarding acceptable work performance and acceptable workplace conduct" and his failure "to properly carry out the duties of his position as a Registered Sanitarian as . . . exhibited by poor work quality and performance issues," which "were communicated to him orally in discussions with his supervisor(s) as well as during staff meetings." (Dkt. # 29, Ex. D.) These are the very instances about which O'Hazo complained in the Original Administrative Complaints. Therefore, the Court concludes that O'Hazo's termination was an act that was logically connected to the prior discriminatory treatment that he had suffered and was carried out in precisely the same manner alleged in the Original Administrative Complaints.[9] Thus, the Court shall consider the termination when discussing both the discrimination and retaliation claims.

8. The 2005 Amended Administrative Complaints reiterate that the 2004 Administrative Complaints were based on age and gender discrimination.

9. The Court believes that the Health District's reliance on *Morgan* and *Brown* is misplaced. As the Health District points out, the Supreme Court in *Morgan* did hold that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061. The Supreme Court's discussion, however, involved whether, for the purpose of filing an EEOC charge, conduct occurring outside the 180– or 300–day time period could be considered timely. That is not the issue before the Court here. In fact, in this case, O'Hazo's termination occurred after the filing of the Original Administrative Complaints and this lawsuit, whereas in *Morgan*, the discussion centered on allegedly wrongful conduct that occurred too far in the past to fall within the required time period.

*Brown* involved a situation where the plaintiff filed his original complaint ninety-six days

after receiving his right-to-sue letter. *Brown*, 2008 WL 687358, at *3. Thus, Judge Droney properly granted summary judgment in favor of the defendant with regard to Title VII claims in original complaint. *Id.* The plaintiff in *Brown* also filed a separate charge with the EEOC, and an amended complaint in the lawsuit, based on his being rejected for an employment position, which occurred after he had filed his original complaint. *Id.* Judge Droney, following *Morgan*, found this claim to be time-barred because the plaintiff had filed the amended complaint more than 200 days after receiving his right-to-sue letter. *Id.* The issues in *Brown* were whether, after receiving his right-to-sue letters, the plaintiff had timely filed his complaint and amended complaint, not whether the claims regarding the rejection of the employment position were "reasonably related" to the claims in the original complaint. Indeed, because the original complaint in *Brown* was itself untimely and could not be considered, there was nothing to which the subsequent claims could be reasonably related. Thus, the factual background and legal analyses in *Brown* are inapposite here.

### E. TITLE VII/ADEA/CFEPA

In light of the above, O'Hazo's remaining claims are that he suffered discriminatory treatment, including termination, and that he was retaliated against, based on his sex and age in violation of Title VII, the ADEA, and CFEPA. The Health District argues that there is no genuine issue of material fact as to O'Hazo's claims and that it is entitled to judgment as a matter of law.

#### 1. Sex and Age Discrimination

Title VII directs that it is "unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex. . . ." 42 U.S.C. § 2000e–2(a)(1). The ADEA provides that it shall be "unlawful for an employer . . . to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . ." 29 U.S.C. § 623(a)(1). The ADEA's prohibition against discrimination based on age protects employees who are at least forty years old. 29 U.S.C. § 631(a). CFEPA directs that "[i]t shall be a discriminatory practice in violation of this section . . . [f]or an employer . . . to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment because of the individual's . . . age[ ] or sex. . . ." Conn. Gen.Stat. § 46a–60(a)(1).

Title VII claims are analyzed using the familiar burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Claims of age discrimination under the ADEA are analyzed "under the same burden shifting framework as claims brought pursuant to Title VII . . . ." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). In addition, "[t]he Connecticut Supreme Court looks to federal precedent when interpreting and enforcing CFEPA." *Kelley v. Sun Microsystems, Inc.*, 520 F.Supp.2d 388, 400 (D.Conn.2007) (internal quotation marks omitted); *see Levy v. Comm'n of Human Rights and Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996) ("Although this case is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own anti-discrimination statutes.") Accordingly, the Court will analyze O'Hazo's Title VII sex discrimination, ADEA age discrimination, and CFEPA sex and age discrimination claims together. *See Williams v. Quebecor World Infiniti Graphics*, 456 F.Supp.2d 372, 383 (D.Conn.2006).

The Second Circuit has described the *McDonnell Douglas* burden-shifting framework as follows:

> At the outset, a plaintiff can avoid dismissal by presenting the "minimal" prima facie case defined by the Supreme Court in *McDonnell Douglas*. This requires no evidence of discrimination. . . . By making out this "minimal" prima facie case, even without evidence of discrimination, the plaintiff creates a presumption that the employer unlawfully discriminated, . . . and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action.
>
> . . .
>
> On the other hand, once the employer articulates a non-discriminatory reason for its actions, . . . the presumption completely drops out of the picture. . . . The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains at all times with the plaintiff. . . . Thus, once the

employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment (or to the overturning of a plaintiff's verdict) unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.

*James v. N.Y. Racing Ass'n,* 233 F.3d 149, 153–54 (2d Cir.2000) (internal quotations marks and citations omitted).

To establish a prima facie case of employment discrimination, a plaintiff must establish four elements. First, he must demonstrate that he belonged to a protected class. *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 (2d Cir.2002). Second, he must show that he was qualified for the position. *Id.* Third he must prove that he suffered an adverse employment action. *Id.* Fourth, he must show that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Id.*

O'Hazo has satisfied the first element of the prima facie case because he is sixty-two years old and a male, both protected classes under Title VII, ADEA, and CFEPA. The second element is also satisfied because the parties do not dispute that O'Hazo was qualified for the position.

■ The third element is satisfied as to O'Hazo's termination, for the Health District concedes that O'Hazo's termination qualifies as an adverse employment action. Nevertheless, the Court does not believe that the four remaining incidents of allegedly discriminatory treatment, namely, the Compensatory Time Denial Meeting, the December Supervisory Memorandum, the Giamatti Little League Complex Meeting, and the Century Buffet Incident, reasonably qualify as adverse employment actions here. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment."

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000). A "materially adverse change" in the terms or conditions of employment must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation marks omitted); *see also Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) (noting that Title VII does not provide redress for every "minor, ministerial stumbling block"). Conduct that the Second Circuit has deemed sufficiently disadvantageous to constitute an adverse employment action in employment discrimination cases includes "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya,* 202 F.3d at 640 (internal quotation marks omitted).

The Compensatory Time Denial Meeting does not suffice as adverse because Checko eventually allowed O'Hazo to attend the meeting while still being paid for the work that he was missing. No reasonable jury could find that O'Hazo had suffered an adverse action merely because Checko initially denied O'Hazo's request to attend the meeting.

The December Supervisory Memorandum Incident also cannot be considered adverse merely because O'Hazo's found Amodio's memorandum to be unnecessary or unfair. Amodio was O'Hazo's superior and it goes without saying that a supervisor is responsible for evaluating and critiquing the work of subordinates. Amodio relayed to O'Hazo that his submitted report was confusing and misleading. This does not qualify as a materially adverse change in the terms and conditions of O'Hazo's employment.

In similar vein, the Giamatti Little League Complex Incident can not be considered adverse merely because O'Hazo was criticized for not performing duties that he was supposed to perform. O'Hazo claims that this was a prioritization issue, and admits that he did not perform the duties. When employees do not complete their work in a manner that satisfactory to their bosses, criticism is a common and likely result. Such criticism does not qualify as a materially adverse change in the terms and conditions of O'Hazo's employment.

The Century Buffet Incident also cannot be considered an adverse employment action because O'Hazo has not demonstrated that the written reprimand resulted in an alteration of the terms or conditions of his employment or that these actions put his position in jeopardy. *See Stembridge v. City of New York,* 88 F.Supp.2d 276, 283 (S.D.N.Y.2000) (finding that the plaintiff had not established an adverse employment action where he failed to show that a reprimand had "a cognizable or material impact on the terms or conditions of his employment"); *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 284 (S.D.N.Y. 1999), *aff'd,* 205 F.3d 1327 (2d Cir.2000) ("Negative evaluations alone, without any accompanying adverse result, however, are not cognizable.... Given that plaintiff's negative reviews did not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment.")

█ With regard to the fourth element of the prima facie case, there is a dispute

between the parties as to whether the circumstances surrounding the decision to terminate O'Hazo give rise to an inference of discrimination. To show that O'Hazo's termination took place under conditions giving rise to an inference of discrimination, O'Hazo must demonstrate that the defendants "treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000). To do this, O'Hazo must prove that he was "similarly situated in all material respects" to the individuals with whom he compares himself. *Longshore–Pizer v. Connecticut,* 451 F.Supp.2d 401, 408 (D.Conn.2006) (quoting *Shumway v. United Parcel Serv. Inc.,* 118 F.3d 60, 64 (2d Cir.1997)). "[T]o satisfy [the] 'all material respects' standard for being similarly situated, a plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards." *Graham,* 230 F.3d at 40.

█ Here, O'Hazo claims that there are at least three other similarly situated employees, Wagner, Amodio, and Elsie Cabanas ("Cabanas"),[10] who were treated more favorably because "they were subject[ed] to less criticism than he was." (Dkt. # 34, pp. 13–14.) Amodio, however, was not only O'Hazo's immediate supervisor, but also was one of the supervisors who allegedly discriminated against him. She cannot be considered similarly situated to O'Hazo. With regard to Caban, the record reveals little, if any, information about her, let alone information sufficient to establish that Caban was similarly situated to O'Hazo.[11] Thus, the Court cannot

---

10. In the parties' submissions, the Court has found references to both an "Elsie Cabanas" and an "Else Caban." Presumably, these two names refer to the same person. The Court shall use the name "Elsie Cabanas."

11. The Court has found references in the record that Cabanas was a secretary. This fact alone would make a comparison between her and O'Hazo pointless, as O'Hazo's work duties and responsibilities were not those of a secretary.

deem her to be similarly situated. Wagner, who is female and younger than O'Hazo, held the same position as O'Hazo and, like O'Hazo, had Amodio as a supervisor. Based on the record before the Court Wagner appears to have been similarly situated to O'Hazo and therefore was subjected to the same performance evaluation and discipline standards.

Next, O'Hazo must show an inference of discrimination. O'Hazo is unable to do this because he merely argues that he was subjected to disparate treatment because similarly situated employees "received more favorable treatment" and were "subject to less criticism." (*Id.*) This statement, by itself, does not establish disparate treatment or an inference of discrimination with regard to his similarly situated female co-worker, Wagner. That is, O'Hazo must point to specific examples of disparate treatment, not make conclusory statements about how he was subjected to a different level of scrutiny than Wagner.[12]

Moreover, the evidence demonstrates that the Health District has had to address performance issues with Wagner, just as it did with O'Hazo. For example, O'Hazo received a written reprimand for not inspecting the shellfish properly at Century Buffet Incident in June 2006. Wagner and Amodio, both of whom are female and younger than O'Hazo, were also present at Century Buffet, and received written warnings. As the Health District found that Wagner had no direct involvement in the inspection (unlike O'Hazo, who was in charge of the inspection), her written reprimand was later reduced to a verbal rep-

rimand. It appears, however, that Amodio's written reprimand stood, indicating that the Health District was not more lenient to females who were younger than O'Hazo.

In addition, O'Hazo admits that Wagner's performance has been criticized on other occasions by the Health District. (Dkt. # 29, Ex. A, O'Hazo Depo. at 61–62.) In terms of being denied overtime opportunities, Amodio would often make overtime available at the last minute so that both O'Hazo and Wagner were deprived of these opportunities. (*Id.* at 174–75.) If anything, O'Hazo believes that he received more overtime opportunities than Wagner because he was able to take more of the last minute opportunities. (*Id.* at 176–77.) Moreover, O'Hazo ultimately was allowed to use compensatory time to attend the Worker's Compensation Commission meeting, and he has not identified another employee who requested and received compensatory time to attend such a meeting. (*Id.* at 181.)

The Health District kept supervisory files on employees who had complaints filed against them or who had exhibited performance problems. (Dkt. # 29, Ex. C, Checko Aff. ¶¶ 6–7.) The Health District maintained these files for Wagner and Amodio, just as it did for O'Hazo. (*Id.*) With respect to any memoranda written to address performance issues, O'Hazo testified that he did not know whether similar memoranda had been written for other employees. (Dkt. # 29, Ex. A, O'Hazo Depo. at 61.) O'Hazo also did not know if Checko held meetings with any other em-

---

**12.** O'Hazo testified that he did not see younger and/or female co-workers being subjected to the same scrutiny or discipline that he received. This is not evidence of disparate treatment, but of O'Hazo's perceptions of his working conditions. To actually prove disparate treatment, he would, for example, have

to show that he and a younger (or female) co-worker conducted themselves in a similar way while performing their work duties, but the Health Department, in response to this conduct, treated him in a more negative way than the other co-worker. O'Hazo has not done this.

ployees to address complaints or performance issues. (*Id.* at 74, 94.) O'Hazo has not provided any evidence that Wagner, or any other employee, has been given more favorable treatment under similar circumstances in a disciplinary or work performance situation. Thus, in the Court's view, the circumstances surrounding the decision to terminate O'Hazo do not give rise to an inference of discrimination. O'Hazo has failed to establish a prima facie case for sex discrimination under Title VII, age discrimination under the ADEA, or sex and age discrimination under CFEPA.[13] Thus, with regard to O'Hazo's discrimination claims under Title VII, the ADEA, and CFEPA, the Health District's supplemental motion for summary judgment (dkt. # 43) is **GRANTED**.

### 2. Retaliation

The remaining claims are O'Hazo's retaliation claims based on his termination. Title VII, the ADEA, and CFEPA prohibit retaliation against employees who exercise rights protected by those statutes. *See* 42 U.S.C. § 2000e–3(a); 29 U.S.C. § 623(d); Conn. Gen.Stat. § 46a–60(a)(4). Such retaliation claims are reviewed under the *McDonnell Douglas* burden shifting framework. *See Terry,* 336 F.3d at 141 ("The *McDonnell Douglas* burden-shifting analysis used in claims of discrimination . . . also applies to retaliation claims. . . ."). The first step is to determine whether the plaintiff established a prima facie case of retaliation. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The plaintiff's burden at this stage is slight—he may establish a prima facie case with *de minimis* evidence. *See Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988).

To establish a prima facie case of retaliation, an employee must show "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Terry,* 336 F.3d at 141 (internal quotation marks and citations omitted).

If a plaintiff establishes a prima facie case, a "presumption of retaliation arises" and "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005). "This burden is one of production, not persuasion; it can

**13.** Even if O'Hazo had established a prima facie sex or age discrimination case, the Health District provided legitimate, non-discriminatory reasons for his termination. It would then fall to O'Hazo to demonstrate that these proffered reasons were pretext for unlawful discrimination. That is, O'Hazo must show that his termination occurred because of his sex or age. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that Title VII is directed only at discrimination based upon the categories protected by Title VII). O'Hazo has not done this. A finding by the Department of Labor that the O'Hazo's actions at work, which were the proffered reasons for his termination, did not constitute "wilful misconduct" is of little relevance here. "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 331 (3d Cir.1995) (internal quotation marks omitted). That is, absent some evidence that the termination was motivated by unlawful discrimination, it does not matter whether or not the decision to terminate O'Hazo's employment was based on any wilful misconduct. The Court simply sees no evidence that the Health Department harbored racial or age animus toward O'Hazo. Therefore, even if O'Hazo had satisfied the requisite prima facie elements, his sex and age discrimination claims would ultimately fail under the *McDonnell Douglas* framework.

involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks omitted).

If the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff has the ultimate burden to persuade the trier of fact that he or she was victim of illegal retaliation. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir.2001); *see Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097 ("the *McDonnell Douglas* framework— with its presumptions and burdens—disappear[s], ... and the sole remaining issue [is] discrimination *vel non* ....") (internal quotation marks and citations omitted).

To establish his prima facie case, O'Hazo must show that he participated in a protected activity that the Health District was aware of; that he suffered an adverse employment action; and that there was a causal connection between the protected activity and the adverse employment action. In this case, the first two elements are not in dispute: (1) O'Hazo engaged in protected activities by filing the administrative and district court complaints against the Health District; and (2) O'Hazo suffered an adverse employment action when the Health District terminated his employment. The parties dispute whether O'Hazo has demonstrated the third element, i.e., whether there was a causal connection between filing the complaints and his termination.

A causal connection between a protected activity and an adverse employment action may be established by direct or indirect evidence. Direct evidence is shown "through evidence of retaliatory animus directed against a plaintiff by the defendant." *De Cintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987). A causal connection is shown through indirect evidence either by showing that the protected activity was followed closely by an adverse action, *see Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir.2001), or by showing other evidence such as disparate treatment of fellow employees who engaged in similar conduct, *see De Cintio*, 821 F.2d at 115.

O'Hazo has not provided direct evidence to prove a causal connection, nor has he shown that fellow employees who engaged in similar conduct received disparate treatment. Therefore, the only basis O'Hazo has for establishing a nexus is the temporal proximity between the protected activity and the adverse action. The Second Circuit has found that when multiple incidents of protected activities exist, a district court must consider each incident in evaluating whether the plaintiff has established a prima facie case under Title VII. *See Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir.2001) (finding that the district court erred in considered a 1995 EEOC complaint but failed to consider a 1987 EEOC complaint and a 1995 internal police complaint). Here, prior to O'Hazo's termination on December 15, 2006, there existed three incidents of protected activities: (1) the March 2, 2004 filing of the 2004 Administrative Complaints; (2) the July 21, 2005 filing of the 2005 Amended Administrative Complaints; and (3) the January 13, 2006 filing of the original complaint.

"The Second Circuit 'has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'" *Farrar v. Town Of Stratford*, 537 F.Supp.2d 332, 354 (D.Conn. 2008) (quoting *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir.2001) (collecting cases)). Still, "[i]n the Second Circuit and

district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship." *Wilks v. Elizabeth Arden, Inc.,* 507 F.Supp.2d 179, 196 (D.Conn.2007) (citing *Deravin v. Kerik,* No. 00 CV 7487(KMW)(KNF), 2007 WL 1029895, at *11 (S.D.N.Y. April 2, 2007) (collecting cases)). The temporal proximity between O'Hazo's termination and the 2004 Administrative Complaints is over thirty-five months. The temporal proximity between O'Hazo's termination and the 2005 Amended Administrative Complaints is over sixteen months. Thus, the Court finds that the temporal proximity between these two protected activities and O'Hazo's termination is insufficient establish a causal connection.

O'Hazo's termination, on the other hand, occurred more than eleven months (but less than twelve months) after he filed the original complaint in this case. As this Court has noted, "[w]ithin the time period of one year, there is no firm rule." *Id.* Nevertheless, the dividing line tends to be, in general, a two- or three-month lapse between the protected activity and the adverse employment action. *See Woods v. Enlarged City School Dist. of Newburgh,* 473 F.Supp.2d 498, 529 (S.D.N.Y.2007) (collecting cases). Moreover, as the Supreme Court has pointed out, "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close[ ]...." *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks and citations omitted). In the Court's view, the eleven-month gap here does not establish a "very close" temporal proximity.

O'Hazo does argue, however, that

There is ample evidence that the [Health District's] actions are in retaliation for [O'Hazo's] previous complaints of discrimination. The [Health District's] behavior PRIOR to [O'Hazo's] legal action is telling. In the first summary judgment based on [O'Hazo's] original complaint, the [Health District] claims that there had been no adverse employment actions against [O'Hazo]. Suddenly after [O'Hazo] initiates a legal action against the [Health District], [O'Hazo] suffers from a rash of disciplinary incidents.

. . .

[O'Hazo] initiated the instant complaint in January 2006. By October 2006, the [Health District] had compiled a series of disciplinary incident[s] to support terminating [O'Hazo].

(Dkt. # 46, p. 8.)

The Court is not persuaded by this argument. Throughout the course of this case, O'Hazo has repeatedly maintained that both before and after he filed the 2004 Administrative Complaints and the 2005 Amended Administrative Complaints, the Health District began to find fault with his work performance, as evidenced through a series of disciplinary incidents. That is, O'Hazo consistently has argued that, even before he engaged in the protected activities, he suffered multiple adverse incidents and disciplinary proceedings. This prevents him from creating an inference of retaliation. *See Slattery v. Swiss Reins. America Corp.,* 248 F.3d 87, 95 (2d Cir. 2001). ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Accordingly, O'Hazo has

failed to meet his burden of establishing a prima facie retaliation case, and his claims fail as a matter of law.[14]  Consequently, with regard to O'Hazo's retaliation claims under Title VII, the ADEA, and CFEPA, the Health District's supplemental motion for summary judgment (**dkt. # 43**) is **GRANTED.**

## III.  CONCLUSION

For the foregoing reasons, the Health District's original motion for summary judgment (**dkt. # 29**) is **DENIED as moot,** and the Health District's supplemental motion for summary judgment (**dkt. # 43**) is **GRANTED.  Judgment in favor of Bristol–Burlington Health District shall enter on each count of the Amended Complaint.  The clerk shall close this file.**

---

**14.**  O'Hazo also has not provided the Court with evidence sufficient to demonstrate pretext.  The Court sees nothing in the record indicating that the Health Department's reasons for terminating O'Hazo's employment were pretext for unlawful retaliation.